## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:10-CR-121-ODE-GGB** |
| **MARTEZ HOWARD,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Martez Howard ("Defendant") is charged with two counts each of obstructing interstate commerce by robbery of a McDonald's restaurant and the use of a firearm in furtherance of a crime of violence; and one count of being a felon in possession of a firearm. Pending before this court are Defendant's motions to suppress statements and evidence [Docs. 13 and 15]. An evidentiary hearing on these motions was held before me on June 24, 2010. All transcript references are to the transcript of that hearing.

For the reasons discussed below, I recommend that Defendant's motions [Docs. 13 and 15] be **DENIED**.

I.      **FACTS**

      A.      **The Shootings at McDonald's and the Seizure of Defendant's Clothes**

On December 30, 2009, an armed gunman wearing a ski mask attempted to rob a McDonald's restaurant on Ralph David Abernathy Boulevard in Atlanta, Georgia. Johnnie Mahone ("Mahone"), an armed security guard at the McDonald's, was shot by the gunman several times.  Mahone shot back at the gunman and struck him at least once in the chest.  The injured gunman fled the scene.  (Tr. 7-9, 24).

An ambulance transported Mahone from the McDonald's to Grady Memorial Hospital ("Grady").  Before being taken away from the McDonald's, Mahone spoke briefly with Detective Craig Fries of the Atlanta Police Department ("APD") about the robbery attempt.  (Tr. 7).  Detective Fries then followed the ambulance to Grady and again met with Mahone in the emergency room ("ER") of the hospital while Mahone was being treated for his gunshot wounds.  (Tr. 5-6, 9).

Prior to December 30, 2009, Detective Fries had been to the ER at Grady around 25 times.  (Tr. 20).  The ER has a trauma area where patients in critical condition are taken on gurneys to get emergency medical treatment.  (Tr. 19, 22).  In the trauma area, there are four trauma "rooms"; the patients are separated by curtains on both sides of

2

their beds.  (Tr. 22-23).  On numerous occasions, Detective Fries has seen members of the public walk into the rooms where trauma victims are taken.  (Tr. 21).

On December 30th, Detective Fries located Mahone in a trauma room by asking a member of the medical staff where the gunshot victim from Ralph David Abernathy was located. (Tr. 23).  While Detective Fries was speaking to Mahone, Defendant was brought into the same trauma area of the ER with a gunshot wound to his chest. (Tr. 10-11).  The ER medical staff began tending to Defendant.  Although Defendant and Mahone were about five feet apart, they were separated by a curtain and could not see each other.  (Tr. 10-12).  However, upon hearing Defendant's voice, Mahone immediately identified Defendant as the gunman and told Detective Fries,  "That's the guy that shot me.  That's the guy that shot me.  That's his voice. That's him." (Tr. 12-13, 26).

From his vantage point near the foot of both beds, Detective Fries watched the ER medical staff treating Defendant.  He saw that Defendant had been shot in the chest area. (Tr. 13-14).  Detective Fries observed the medical staff cut off Defendant's jeans and shirt and throw them on the floor near the foot of Defendant's bed.  The discarded clothing was soaked in blood and was wet and muddy from the rain.  The clothing was

3

cut up in a manner that made it no longer usable. (Tr. 14-15). After about 10 minutes in the trauma room, Defendant was rushed off to the operating room. (Tr. 15).

During the time period from the robbery to Defendant's arrival at the hospital, the APD did not receive any reports of other shootings in the area. (Tr. 9-10). Considering all of the circumstances, including Mahone's identification of Defendant by his voice, the timing of Defendant's arrival at the ER, and Defendant's bullet wounds, Detective Fries concluded that Defendant was the person who attempted to rob the McDonald's and decided that Defendant would be arrested. (Tr. 36). However, Detective Fries did not do anything to physically restrain Defendant because Defendant was being treated for his bullet wounds and was about to be taken to the operating room. (Tr. 40).

After Defendant was taken to surgery, his cut-up bloody clothing was left on the floor of the trauma room. Detective Fries believed that the pieces of clothing had high evidentiary value because they could possibly be linked back to the robbery. (Tr. 15-16). After everyone else had left the room, Detective Fries picked the clothing up off the floor and placed it in a brown paper bag. (Tr. 32). As Detective Fries was leaving, he told someone at the hospital that he had taken the clothes. (Tr. 32).

4

Defendant moves to suppress evidence of his clothing taken from the floor of the hospital trauma room.  [Doc. 15].

**B.**     **Defendant's Statement**

On March 15, 2010, Special Agent Allan McLeod of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and APD officer Richard Light (who was task forced to the ATF) visited Defendant at the Fulton County Jail.  (Tr. 47). Defendant was in custody on state charges stemming from the December 30th attempted robbery of the McDonald's, including attempted armed robbery and possession of a firearm during the commission of a felony.  Agent McLeod identified himself and showed Defendant his credentials.  He then informed Defendant of his <u>Miranda</u> rights by reading from a pre-printed card.  (Tr. 49-50).

After the agent read Defendant his rights, Defendant said, "I just don't know why you are here."  (Tr. 52).  The agents told him that they were there to talk about a federal investigation, not the pending state charges.  (Def.'s Ex. 9).  The agents then asked Defendant how he had been shot and if he had a gun or access to a gun.  (<u>Id.</u>; Tr. 74-77).

Defendant told the agents that he had been shot by someone named Rico in a dispute over a marijuana deal outside the house of his friend, Latonia Barner.  (Def.'s

AO 72A
(Rev.8/8
2)

Ex. 9).  When the agents told Defendant about the armed robbery at the McDonald's that occurred at the same time that Rico had supposedly shot Defendant, Defendant denied knowing anything about an armed robbery.  Defendant then asked for an attorney and said that he did not want to talk anymore.  At that point, the interview ended.  (<u>Id.</u>; Tr. 55, 75-76).

## II.   **DISCUSSION**

### A.   **Seizure of Defendant's Clothing**

Defendant contends that the warrantless seizure of his clothing from the floor of the hospital trauma room violated his rights under the Fourth Amendment.  Defendant argues that the seizure of his clothing was illegal because he retained a possessory interest in his clothing at the time it was seized and the government did not have a warrant to seize it.  The government argues that the warrantless seizure of Defendant's clothing was justified because: (1) Defendant had no expectation of privacy in the discarded clothing; (2) the plain view exception allowed Detective Fries to seize the clothing; (3) Detective Fries seized the clothing incident to Defendant's arrest; and (4) there were exigent circumstances.

6

I find that at least the plain view exception and exigent circumstances exception to the warrant requirement apply here and allowed Detective Fries to take Defendant's clothing from the hospital floor without a warrant.[1]

### 1.    *Plain View Doctrine*

The "plain view" doctrine allows officers to seize an item for which they do not have a warrant if the seizing officer was lawfully in a position to observe the item and its incriminating character was immediately apparent.  Horton v. California, 496 U.S. 128, 136-37 (1990).  Defendant argues that the plain view doctrine does not apply because Detective Fries was not lawfully in the presence of the clothing at Grady Hospital.  [Doc. 33 at 18].  I reject this argument.

Neither party presented any direct evidence on whether Grady has a policy that allows police officers on official duty to enter the ER in order to investigate crimes. However, Detective Fries testified that he had previously been inside Grady's ER without special approval on approximately 25 occasions.  (Tr. 20).  Hospital staff members told Detective Fries where he could find the victim, Johnnie Mahone.

---

[1] Because the court is ruling in the government's favor on the basis of the plain view and exigent circumstances exceptions to the warrant requirement, the court does not reach the government's argument's regarding Defendant's expectation of privacy and seizure incident to an arrest.

AO 72A
(Rev.8/8
2)

Mahone spoke willingly with the officer, and no one ever told Detective Fries to leave. These circumstances support the inference that police officers on official duty were allowed to enter the ER.

Defendant cites <u>Jones v. State</u>, 648 So.2d 669, 677-78 (Fla. 1994) for the proposition that a defendant's hospital room is not a public place into which police may enter and seize evidence.  However, the room in <u>Jones</u> was not the emergency room, but rather a patient's room to which Jones had been assigned after he had been admitted to the hospital.  <u>Id.</u> at 675.  Courts from other jurisdictions that have addressed the issue of whether police may lawfully enter an emergency room to investigate a crime have held that a defendant does not have a reasonable expectation of privacy in an emergency room.  <u>See, e.g.</u>, <u>Dombrovski v. State of Alaska</u>, 2000 WL 1058953, at *3 n.5 (Alaska Ct. App. Aug. 2, 2000)(collecting cases).

From the testimony at the hearing, the weight of the relevant case law, and the logical rationale that would allow police officers to enter the ER to investigate crimes (especially violent crimes that have just occurred) by interviewing crime victims and witnesses, I conclude that Detective Fries was lawfully present in the ER when he observed Defendant's cut-up clothing on the floor.

8

Defendant also relies on <u>United States v. Neely</u>, 345 F.3d 366 (5th Cir. 2003). In <u>Neely</u>, as here, the defendant sustained a gunshot wound and was taken to the hospital trauma unit, where medical personnel removed his clothing. Neely's clothing was collected, placed in a plastic bag, and put into a clothing storeroom where, pursuant to hospital policy, it would be kept for five or six days to give the owner an opportunity to claim it. If the clothing was not claimed during that time period, it would be thrown away. <u>Id.</u> at 368.

While Neely was in surgery or shortly thereafter, an officer went to the hospital to retrieve Neely's clothing. Medical personnel gave the officer the clothing upon the officer's request. <u>Id.</u>

The government in <u>Neely</u> attempted to rely (among other arguments) on the "plain view doctrine" to justify the seizure. The court in <u>Neely</u> rejected the government's "plain view" argument because the officer did not have a lawful right of access to the storage room or the plastic bag in which the hospital had stored Neely's clothing at the time the clothing was seized. <u>Id.</u> at 369.

9

In contrast, here, Defendant's clothing had *not* been retrieved, moved, and/or stored by hospital personnel.  Detective Fries picked the clothing up from the floor where it had been thrown.[2]  Thus, this case is distinguishable from Neely.

In addition, the incriminating nature of Defendant's clothing was immediately apparent to Detective Fries.  Mahone had identified Defendant by his voice as the armed robber whom Mahone had shot in the chest.  Both Mahone and Defendant had been brought into the hospital at about the same time, and Defendant had a gunshot wound consistent with Mahone's description of the events.  Thus, the pieces of bloody clothing served as a clear evidentiary link tying Defendant to the attempted robbery.

The facts of this case are very similar to two district court cases in which the courts declined to suppress evidence of a defendant's clothing removed from him at the hospital.  First, in United States v. Franklin, 64 F. Supp. 2d 435 (E.D. Pa. 1999),  the defendant was rushed to a hospital emergency room for a gunshot wound.  The medical

---

[2] Although Defendant presented evidence of a policy at Grady for securing valuables of patients admitted through the ER (Def.'s Ex. 12), it is clear that the procedure was not followed with respect to Defendant's cut-up clothing. While it is not necessary for the application of the plain view doctrine, I infer that Defendant's clothing would have been disposed of by the hospital if it had not been collected by Detective Fries. Indeed, once Defendant left the trauma area, it was unlikely that the hospital staff would have been able to correctly identify the owner of the cut-up pieces of bloody and muddy clothing on the floor.

10

staff cut off Franklin's clothing from his body and threw the clothing on the floor. A police officer placed Franklin under arrest and collected the bloody, cut-up articles of clothing from the floor. The court declined to suppress evidence of Franklin's clothing based, in part, on the application of the plain view doctrine. Id. at 439.

Second, in United States v. Davis, 657 F. Supp. 2d 630 (D. Md. 2009), the defendant Davis was admitted to the hospital with a gunshot wound. The hospital notified the police that it was treating a gunshot victim. When an officer arrived at the hospital to investigate, he located Davis in the emergency room laying on a bed or gurney. The officer secured Davis's pants and boxer shorts, which had been removed by hospital personnel, placed in a bag and stored on a shelf behind the bed. Id. at 634. Another officer who also responded to the hospital seized the clothing as evidence. Id.

The court in Davis had no trouble finding that the officers were lawfully present in the emergency room because they were there on official business investigating a shooting. Id. at 637-38. The court also found that the officers had direct lawful access to the storage area beneath Davis's bed where the bag of clothing had been placed (thus distinguishing Neely, where the plain view doctrine did not apply because the officer did not have lawful right of access to the hospital property storage room and had to ask medical personnel to retrieve the clothes). Finally, the court found that under the

AO 72A
(Rev.8/8
2)

totality of the circumstances, which included the "obvious fact" that the defendant had been shot in an area usually covered by clothing, it was a "foregone conclusion" that the bag underneath the defendant's bed would contain his clothing, "and that the clothing would constitute evidence of the shooting (*i.e.*, blood stains and bullet holes)." <u>Id.</u> at 639-41.

Based on the evidence presented and the relevant case law, I find that Detective Fries was lawfully in the presence of Defendant's bloody clothing, and its incriminating character was immediately obvious.   Thus, he was entitled to seize Defendant's clothing without a warrant under the plain view doctrine.

### 2.      *Exigent Circumstances*

The government also relies on exigent circumstances.  It argues that if Detective Fries had not collected Defendant's clothing, the detective risked that the clothing with "high evidentiary value" would have been thrown away.  (Tr. 15-16; Doc. 35 at 9).

"Exigent circumstances arise when authorities have reason to believe that evidence is in danger of being destroyed or removed."  <u>United States v. Mikell</u>, 102 F.3d 470, 475 (11th Cir. 1996)(citing <u>United States v. Tobin</u>, 923 F.2d 1506, 1510 (11th Cir. 1991)).  "The test of whether exigent circumstances exist is an objective one. The appropriate inquiry is whether the facts would lead a reasonable and experienced

12

police officer to believe that evidence might be destroyed or removed before a warrant could be secured." Id. (citing United States v. Young, 909 F. 2d 442, 446 (11th Cir. 1990)(internal citations omitted)).

In the Franklin case discussed above, the court found exigent circumstances. The court stated, "We believe that these articles of clothing were properly seized by the police. Had they not been seized, they would have been thrown out." Franklin, 64 F. Supp. 2d at 438; see also United States v. Nanos, 2006 WL 3469633, at *15 (D. Me. Nov. 3, 2006)(finding it reasonable to infer that a latex glove that the defendant had been wearing when brought to the hospital that lay on the floor near his hospital bed would have been thrown in the trash if not seized by the police). The same reasonable inference is present here.

If Detective Fries had not collected Defendant's clothing from the floor, at the very least, the chain of custody would have been broken, as Defendant and all of the hospital staff had left the room, leaving the soiled, cut-up pieces of clothing on the floor. Moreover, as stated above, the totality of the circumstances supports the conclusion that the items would have been thrown away because the hospital staff made no effort to collect and preserve the clothing before they left the room, and the cut-up clothing would have had no value to Defendant.

13

For these reasons, I find that exigent circumstances, *i.e.*, the need to preserve evidence, allowed Detective Fries to seize Defendant's cut-up clothing from the floor of the ER.

### B.   Defendant's Statements

Defendant does not dispute that he received full <u>Miranda</u> warnings.  Rather, he contends that his statement should be suppressed because the agents misrepresented the purpose for their interview of him.  However, Defendant has not shown that the agents misrepresented the reasons for their interview.  Agent McLeod told Defendant that he was there to speak about a federal investigation and not to talk about Defendant's pending state charges. (Def.'s Ex. 9).  This was a true statement, although the federal and state charges grew out of the same incidents.  At most, the agents did not fully explain the potential federal charges against Defendant, and Defendant misunderstood the scope of the potential federal charges.

This case is not at all similar to <u>United States v. Lall</u>, 607 F.3d 1277 (11th Cir. 2010), the case relied upon by Defendant.  In <u>Lall</u>, a detective told the defendant that anything he said would not be used to prosecute him.  <u>Id.</u> at 1286.  Nothing similar happened here.   The agents made no promises to Defendant.  (Tr. 53).

14

Defendant's argument is foreclosed by the United States Supreme Court's holding in <u>Colorado v. Spring</u>, 479 U.S. 564 (1987).  In <u>Spring</u>, the Court held that a "suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."  <u>Id.</u> at 577; <u>see</u> <u>also</u> <u>Agee v. White</u>, 809 F.2d 1487, 1495 (11th Cir. 1987)(finding that where "police did not take affirmative steps to mislead a detainee as to the possible consequences of making a confession, *Miranda* does not require that a confession be excluded as involuntary solely because of the detainee's subjective misunderstandings of those consequences.").

**III.   CONCLUSION**

For the reasons stated, I **RECOMMEND** that Defendant's Motion to Suppress Statements [Doc. 13] and Motion to Suppress Evidence [Doc. 15] be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 9th day of February, 2011.

GERRILYN G. BRILL

15

UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)