FILED IN CHAMBERS
U.S.D.C. - Atlanta

APR 1 5 2011

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARTEZ HOWARD

CRIMINAL CASE NO.

1:10-CR-121-ODE

ORDER

This criminal case is before the Court on Defendant Martez Howard's ("Defendant") objections [Doc. 47] to the Report and Recommendation ("R&R") issued by Magistrate Judge Gerrilyn G. Brill [Doc. 41], in which Magistrate Judge Brill recommended that Defendant's Motion to Suppress Evidence [Doc. 15] and Motion to Suppress Statements [Doc. 13] be denied.  For the following reasons, Defendant's objections [Doc. 47] to the R&R are OVERRULED and the R&R [Doc. 41] is ADOPTED.  Defendant's Motion to Suppress Evidence [Doc. 15] and Motion to Suppress Statements [Doc. 13] are DENIED.

I.    Factual Background

On the evening of December 30, 2009, Detective Craig Fries of the City of Atlanta Police Department ("APD"), who operated in the Zone 4 criminal investigations unit, responded to a reported armed robbery of a McDonald's restaurant located at 1166 Ralph David Abernathy Boulevard in Atlanta, Georgia [Suppression Hr'g Tr. at 6-7, 9].  Detective Fries, wearing plain clothes, drove to the McDonald's in his detective car [Id. at 17].  Detective Fries testified at the suppression hearing that when he arrived at the McDonald's, he encountered a man named Johnnie Mahone, who worked

as an armed security guard for the restaurant [Id. at 6-7, 9]. Mr. Mahone was suffering from multiple gunshot wounds which he told Detective Fries he sustained when he tried to intervene in the robbery attempt [Id. at 7]. Mr. Mahone told Detective Fries that a black male wearing a ski mask entered and robbed the McDonald's restaurant [Id. at 7, 18]. Mr. Mahone stated that he attempted to stop the robbery, at which time the robber shot him [Id. at 7]. Mr. Mahone stated that he then fired his weapon approximately four times and that he was positive he shot the robber in the chest [Id. at 7-8]. He stated that the wounded robber then left the scene [Id. at 9].

Shortly after Detective Fries arrived at the McDonald's and began speaking with Mr. Mahone, paramedics transported Mr. Mahone to Grady Memorial Hospital ("Grady Hospital") in Atlanta [Id. at 8]. Detective Fries testified that he followed the ambulance to Grady Hospital in his detective car [Id. at 9, 17]. While en route to Grady Hospital, Detective Fries heard over his handheld radio unit that Zone 4 officers were dispatched to another reported gunshot victim located approximately one and one-half miles from the McDonald's restaurant and that the victim was being taken to Grady Hospital [Id. at 9-10, 34]. Detective Fries testified that he believed the dispatch officer described a "black male [who] was laying in a driveway with gunshot wounds" in a neighborhood called Westview [Id. at 34, 36]. He further testified that this is the only other shooting he recalled hearing about within the Zone 4 precinct that evening [Id. at 10]. He testified, "[w]e don't get that many shootings a night" [Id. at 35].

2

When Detective Fries arrived at Grady Hospital, he entered through the ambulance bay area of the emergency room [Id. at 18]. He asked an unknown Grady Hospital staff member where the gunshot victim from Ralph David Abernathy was located [Id. at 23]. He was directed to and then entered one of the trauma rooms in Grady Hospital's trauma unit, where he found Mr. Mahone [Id. at 19, 23]. The trauma unit, according to Detective Fries (who stated he had been to the emergency room approximately twenty-five times in his capacity as a police officer), is located off a hallway that leads away from the triage area of the emergency room (which is accessible through the ambulance bay doors) [Id. at 19-20]. The unit is used to treat people who arrive at Grady Hospital with critical injuries, including gunshot wounds [Id. at 22]. It is marked with a sign that reads "Red Zone" [Id. at 21]. However, according to Detective Fries, he saw "people, public walking back there [to the trauma unit] all the time" [Id.].

There are four trauma rooms within the trauma unit, each containing several curtains which provide separation between one hospital gurney and the next [Id. at 21-22, 25-27]. Detective Fries testified that when he found Mr. Mahone in one of the trauma rooms, Mr. Mahone was receiving medical treatment for his gunshot wounds but was "doing pretty good" [Id. at 24, 37]. Detective Fries stood at the end of the hospital gurney on which Mr. Mahone was situated, near Mr. Mahone's feet [Id. at 25-26]. Because he was standing near the foot of Mr. Mahone's gurney, Detective Fries was not inside the curtain that flanked the gurney; he could see beyond the curtain separating Mr. Mahone's gurney from the next curtained-off space [Id. at 27].

3

Approximately five minutes after Detective Fries arrived at Grady Hospital to find Mr. Mahone, a second gunshot victim arrived and was placed in the same trauma room as Mr. Mahone [Id. at 10-11]. Detective Fries testified that he overheard paramedics say that the individual came from Westview [Id. at 36]. At the suppression hearing, Detective Fries identified Defendant as this second gunshot victim [Id. at 11]. Grady Hospital staff placed Defendant on a gurney adjacent to Mr. Mahone's gurney, which was approximately five feet away and separated only by a curtain [Id.].

Although the two gunshot victims were in close proximity to one another, the curtain between them prevented Mr. Mahone from seeing Defendant [Id. at 12]. However, Defendant was crying audibly and Mr. Mahone overheard Defendant's cries [Id. at 12-13]. Detective Fries testified that when Mr. Mahone heard Defendant's voice, he said repeatedly "That's the guy that shot me. That's his voice. That's him" [Id. at 13, 26]. Detective Fries also observed from his vantage point at the foot of Mr. Mahone's gurney that Defendant had gunshot wounds to the chest area [Id. at 14]. He saw doctors stick their fingers into Defendant's chest wounds [Id. at 28].

To facilitate Defendant's treatment, Grady Hospital physicians and nurses cut off his jeans and shirt, which were soaked with blood and with mud (it was raining that evening), "and threw [the clothes] on the ground" approximately two feet from his bed [Id. at 14-15]. According to Detective Fries, the clothing "was cut up, and it was no longer usable" [Id. at 14].

4

Detective Fries testified that at that point, he "put all the facts together"—including Mr. Mahone's statements about being robbed and shooting the robber in the chest during the robbery, the gunshot report Detective Fries heard over his radio while on his way to Grady Hospital, Defendant's presence at the Grady Hospital trauma center with a gunshot wound to the chest area, and Mr. Mahone's recognition of Defendant's voice as the shooter's—and determined that Defendant was "a suspect and he was under arrest at that point in time" [Id. at 13]. However, due to Defendant's condition, Detective Fries did not physically place Defendant under arrest at that time [Id.].

According to Detective Fries, Defendant remained in the trauma room for approximately ten minutes before physicians moved him to an operating room [Id. at 15]. The personnel attending to Defendant left the room without moving his cut up clothes, which remained on the trauma room floor [Id. at 31]. Detective Fries testified that once Defendant was removed from the room, Detective Fries walked just outside the trauma room, called Detective Turner (presumably his superior), and told Detective Turner that Defendant was in stable condition and would probably survive [Id. at 15, 33]. He also told Detective Turner about the bloody clothing and asked whether he should collect the clothing as evidence [Id. at 15]. Detective Turner answered in the affirmative [Id.].

Detective Fries testified that based on the fact that the clothing was covered in blood and that the robbery occurred just before Defendant arrived at Grady Hospital, combined with the other circumstances linking Defendant to the robbery, he believed

5

the clothing to have "high evidentiary value" [Id. at 15-16].
Detective Fries therefore obtained a brown paper bag from the
emergency room area, picked the clothes up off the floor, and
placed the clothes inside the bag [Id. at 16].   Detective Fries
testified that he said "I got his clothes" to hospital staff as he
was leaving Grady Hospital [Id. at 32].

    In addition to the testimony of Detective Fries, Magistrate
Judge Brill heard testimony from Jordan Dayan, an Investigator for
the Federal Defender Program, who testified that he was charged
with investigating Defendant's case [Id. at 80-81].   Investigator
Dayan stated that he met with DeAngelo Norris, associate general
counsel of legal affairs for Grady Hospital, and asked Mr. Norris
for "[a]ny policy that Grady had concerning personal property of
people  that  were  admitted  to  the  hospital"  [Id.  at  87].
Investigator Dayan testified, "we started trying to figure out
which [policy] would be appropriate for dealing with personal
property" [Id. at 83].   According to Investigator Dayan, Mr.
Norris obtained a policy—the Grady Memorial Hospital Corporation
Operational Policy for the subject of "Patient Personal Valuables
and Assistive Devices" (the "Policy")—from the hospital's internal
computer network and stated that the Policy governed personal
valuables [Id.].   Mr. Norris printed the Policy and gave it to
Investigator Dayan [Id.].   Investigator Dayan testified that Mr.
Norris told him that he thought it would address "what we were
discussing" [Id. at 85-86].   Investigator Dayan stated that he did
not read the policy himself [Id. at 86].

The Policy states:

> It is the policy of the Grady Health System (GHS) to provide a safe environment for our patients and their personal belongings and valuables. GHS is not responsible for the loss and/or damage of any patient's personal effects, valuables and/or any other assisted devices. GHS recommends and encourages patients to refrain from bringing personal belongings and/or valuables to GHS. . . . However, if the patient's medical condition does not permit him/her to maintain his/her personal belongings, GHS will offer provisions for limited safekeeping. This **specifically applies to patients who have an altered mental status, are incapacitated and/or require immediate emergency treatment.**

[Defendant's Ex. 12 at 1]. The Policy includes "clothing" within its definition of "[p]ersonal effects and valuables" [Id.]. Respecting emergency care center admissions, which include patients "in the Trauma/CPR Room," the Policy delineates a process for securing the personal effects and valuables of patients [Id. at 2-3]. The process requires a Patient Valuables Security officer to be notified of valuables to be secured via phone or speaker system and mandates that an Assisting Nurse or Patient Care provider "remove the valuables from the patient's body and place the items on the designated desk," identifying and announcing the type of valuables being removed from the patient so that a Recording Nurse can annotate the items on an "ED Patient Care Record" [Id. at 2]. The Recording Nurse must reconcile the valuables with the Patient Valuables Security Officer [Id.]. The patient's belongings are then placed in a bag that is sealed, labeled, and secured in a designated valuables room [Id. at 2-3]. The Policy does not expressly provide a process for receiving, cataloguing, or storing clothing that emergency medical

professionals have cut off a patient, such as the jeans and shirt medical providers cut from Defendant's body.

Defendant continued to receive treatment at Grady Hospital for his gunshot wound. According to Allan McLeod, Special Agent for the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and co-case agent responsible for Defendant's federal case, APD officers placed Defendant under arrest either in the late evening of December 30 or early morning of December 31, 2009 [Tr. at 45-46, 56]. The ATF subsequently began a federal investigation relating to the McDonald's robbery that occurred on December 30, 2009 [Id. at 56].

On March 15, 2010, Special Agent McLeod accompanied APD officer and ATF agent Richard Light to the Fulton County Jail's medical unit to interview Defendant [Id. at 47]. Special Agent McLeod testified that he and Agent Light conducted the interview in the jail's medical unit not because Defendant remained medically infirm but because the unit permits face to face contact and does not impose a glass barrier between inmates and visitors as other units in the jail do [Id. at 47-48]. According to Special Agent McLeod's testimony at the suppression hearing and the Report of Investigation that he compiled following his interview with Defendant, the purpose of the interview was to speak to Defendant "regarding the whereabouts of the firearm involved in the armed robbery and shooting at the McDonalds [sic] Restaurant located at 1166 Ralph David Abernathy" [Id. at 62-64; Defendant's Ex. 9].

During the interview, Special Agent McLeod and Agent Light each sat in chairs facing a chair in which Defendant sat,

8

unrestrained by handcuffs [Tr. at 49-50].  According to Special
Agent McLeod, the interview proceeded as follows.  First, Special
Agent McLeod identified himself with his credentials and also
identified Agent Light [Id. at 50].  Next, Special Agent McLeod
confirmed Defendant's identity with his ID tag or bracelet [Id.].
Special Agent McLeod next told Defendant that he was going to read
Defendant his Miranda rights and warnings [Id.].  He then read
from his Miranda card that he carries with him as an ATF agent,
which states:

> *Before asking any questions, ask if the person is*
> *willing to answer questions.  If the response is yes,*
> *then advise of the Miranda warnings.  If the response is*
> *no, do not question nor give the Miranda warnings.  If*
> *there has been no request for counsel, you may return*
> *later to attempt questioning.*
> *A waiver is not presumed because the person is silent*
> *after the warnings are given.*
> **The warnings:**
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to consult with an attorney and to
> have them present during questioning.
> If you cannot afford an attorney, one will be appointed
> to represent you prior to any questioning.
> **The waiver:**
> Do you understand your rights?
> Are you willing to waive these rights and talk to me?

[Id. at 50-51; Government's Ex. 1].

Special Agent McLeod testified that Defendant appeared to
understand the warnings read to him [Tr. at 51].  Defendant did
not ask Special Agent McLeod to repeat or explain any of the
warnings, nor did he appear to be intoxicated, under the influence
of any mind-altering substances, ill, or otherwise incapacitated
[Id. at 51-52].  Special Agent McLeod testified that neither he
nor Agent Light threatened Defendant at any point in the interview
and that neither agent promised Defendant anything in return for

engaging in the interview [Id. at 53]. Special Agent McLeod informed Defendant that "if he was truthful and upfront [sic] with us that we would pass that information along to the U.S. attorney," but did not suggest that the agents would recommend to the United States Attorney that Defendant not face federal charges [Id. at 53-54].

After he read the Miranda warnings, Special Agent McLeod asked Defendant, "Do you understand your rights?" [Id. at 51]. Defendant "nodded in affirmation that he did" and verbally indicated his understanding [Id. at 51, 65]. Special Agent McLeod then asked "Are you willing to waive these rights and talk to me?", to which Defendant nodded and, according to Special Agent McLeod, said "Yes. I just don't know why you are here" [Id. at 51-52; 64-65].

Special Agent McLeod responded by telling Defendant that the agents were not going to talk about Defendant's pending state charges but were there to speak about a federal investigation [Id. at 64, 66-67; Defendant's Ex. 9 at 1]. Specifically, Special Agent McLeod told Defendant that he and Agent Light "were here about and to try to find out the sequence of events leading to the whereabouts of the firearm" used in a robbery [Tr. at 66-67]. Special Agent McLeod testified that he told Defendant that a federal investigation was ongoing "in terms of the firearm and the possession of the firearm during the commission of a Hobbs Act" robbery [Id. at 68]. He also told Defendant, "we have a federal investigation as to who did this . . . . Hobbs act robbery of the McDonald's on December 30th, 2009" [Id.].

10

Special Agent McLeod then asked Defendant whether he had ever been convicted of a felony [Id. at 74]. Defendant responded that he was convicted of armed robbery in 1997 stemming from an incident that occurred in a Kroger shopping center [Defendant's Ex. 9 at 1]. Defendant also indicated that he was currently charged with armed robbery in Fulton County [Id.]. Special Agent McLeod then asked Defendant about his health and if he still had any ammunition lodged inside his body [Tr. at 74; Defendant's Ex. 9 at 1]. Defendant responded that he had recovered from injuries sustained as a result of a shooting on December 30, 2009 [Defendant's Ex. 9 at 1]. Defendant told the agents that an individual known as "Rico" shot him "multiple times in a drug deal that had gone bad" [Id.; Tr. at 74]. Defendant described the circumstances leading up to the drug deal, stated that Rico was unhappy with the deal, and told the agents that Rico shot him multiple times in front of the house of one Latonia Barner, located at 1433 Westridge Road in Atlanta [Defendant's Ex. 9 at 1-2]. Defendant stated that Rico was alone and that no one else was around when the shooting occurred [Id. at 2].

Special Agent McLeod next asked Defendant whether he had a gun [Id.]. Defendant said that he did not [Id.]. Special Agent McLeod asked if Latonia Barner had a gun inside her home; Defendant said that Barner did own a firearm [Id.]. Defendant stated that he had a key to Barner's house because they were friends [Id.]. However, he stated that he "don't know about the gun" and did not know what happened to the gun at Barner's house (which had been missing since December 30, 2009) [Id.; Tr. at 64].

11

Special Agent McLeod next asked Defendant if he was aware that an armed robbery and shooting occurred at the same time Rico allegedly shot Defendant, and Defendant stated, "I know nothin' about an armed robbery" [Defendant's Ex. 9 at 2]. Special Agent McLeod then told Defendant that the armed robbery occurred less than two miles from the home of Latonia Barner [Id.]. At that time, Defendant stated that he wanted an attorney and did not wish to talk further [Id.; Tr. at 76-77]. Special Agent McLeod testified that he immediately ceased questioning [Tr. at 79].

Special Agent McLeod testified that although Defendant seemed "annoyed that we were wasting his time," the tone of the interview was "very calm" and "conversational" [Id. at 54].

II.  Procedural History

On March 18, 2010, three days after Special Agent McLeod's interview with Defendant at the Fulton County Jail, a federal grand jury returned a five-count indictment against Defendant [Id. at 73; Doc. 1]. The indictment charged Defendant with: (1) on December 28, 2009, attempting to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count 1); (2) on December 28, 2009, brandishing a firearm during and in relation to a crime of violence (the Count 1 attempted robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 2); (3) On December 30, 2009, attempting to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951; (4) on December 30, 2009, brandishing a firearm during and in relation to a crime of violence (the Count 3 attempted robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and (5) knowingly possessing a

firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (Count 5) [Doc. 1].

After entering a plea of not guilty on April 9, 2010 before Magistrate Judge Russell G. Vineyard [Doc. 7], Defendant filed a Motion to Suppress Statements [Doc. 13] and a Motion to Suppress Evidence [Doc. 15] on May 6, 2010.  Magistrate Judge Brill held a suppression hearing on June 24, 2010 [Doc. 30].  Upon receipt of the transcript of the suppression hearing, Defendant filed a post-hearing brief to support his Motion to Suppress Statements and Motion to Suppress Evidence [Doc. 33] and the Government responded in opposition [Doc. 35].  Defendant subsequently filed a reply brief in response to the Government's opposition [Doc. 40].  On February 9, 2011, Magistrate Judge Brill issued an R&R recommending that Defendant's Motion to Suppress Statements and Motion to Suppress Evidence be denied [Doc. 41].  Defendant filed objections to the R&R on March 9, 2011 [Doc. 47].

III. Discussion

Defendant objects to Magistrate Judge Brill's recommendations that the Court deny his Motion to Suppress Evidence and Motion to Suppress Statements.  Each of these are discussed in turn below.

A.   Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R&R to which Defendant has timely and specifically objected.  The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge.  28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667, 673-74 (1980).

B.   Defendant's Motion to Suppress Evidence

Defendant objects to Magistrate Judge Brill's conclusion that the clothing collected from the Grady Hospital trauma room in which Defendant received treatment was admissible evidence under the plain view and exigent circumstances exceptions to the Fourth Amendment warrant requirement [Doc. 47 at 2, 9-28]. Regarding the plain view exception, Defendant specifically objects to Magistrate Judge Brill's conclusions that Detective Fries was lawfully present in the Grady Hospital trauma room and that the incriminating nature of Defendant's clothing was immediately apparent [Id. at 9-10]. Because the Court agrees with Magistrate Judge Brill's conclusion that the plain view exception applies in this case, the Court does not reach the issue of whether exigent circumstances provide another exception to the warrant requirement.

With respect to the R&R's analysis of the applicability of the plain view exception, Magistrate Judge Brill first found that Detective Fries was lawfully present in the Grady Hospital trauma room when he observed Defendant's clothing on the floor [Doc. 41 at 7-8]. Magistrate Judge Brill based this finding on several facts in the record, including Detective Fries' testimony that: (1) he had been inside the Grady Hospital emergency room on approximately twenty-five prior occasions; (2) hospital staff directed him to Mr. Mahone's location within the trauma unit; (3) Mr. Mahone spoke to him willingly in the trauma room; (4) no one told him to leave the trauma room; and (5) Defendant's clothing had not been moved or stored by hospital personnel when Detective Fries retrieved it [Id. at 7-8, 10]. Magistrate Judge Brill

14

bolstered these facts with persuasive precedent holding that a defendant does not enjoy a reasonable expectation of privacy in an emergency room setting [Id. at 8].

Magistrate Judge Brill next found that the incriminating nature of Defendant's clothing was immediately apparent to Detective Fries, based on testimony showing that: (1) Mr. Mahone and Defendant were brought to the hospital in the same short period of time; (2) Mr. Mahone identified Defendant by his voice; (3) Defendant's clothing was soaked with blood; and (4) Detective Fries observed that Defendant sustained a gunshot wound consistent with Mr. Mahone's description of the robbery [Id. at 10]. Finding that Detective Fries was lawfully present in the trauma room at the time he observed and seized the clothing and that the incriminating nature of the clothing was immediately apparent, Magistrate Judge Brill concluded that seizure of the clothing fit squarely within the plain view exception to the warrant requirement and was therefore admissible over Defendant's Motion to Suppress Evidence [Id. at 12].

The Court agrees with Magistrate Judge Brill's findings and recommendation. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Searches and seizures conducted without a warrant "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-

15

delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted). One of these exceptions, the "plain view" doctrine, justifies the seizure of an object if three criteria (sometimes combined into two elements) are met: (1) the police officer had a "'legitimate reason for being present'" in the location of the object; (2) the object is in plain view in that location; and (3) "'it is immediately apparent to the police that they have evidence before them.'" Horton v. California, 496 U.S. 128, 135-37 (1990) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)); United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995) ("An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." (citing Horton, 496 U.S. at 136-37)).

> 1. Detective Fries' Lawful Presence in the Trauma Room

First, it is "an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Horton, 496 U.S. at 136. If the defendant did not enjoy a reasonable expectation of privacy in the location, then the officer's presence does not violate the Fourth Amendment. United States v. Jacobsen, 466 U.S. 109, 113 (1984). The burden lies with the defendant, as the one claiming Fourth Amendment protection, to show that the officer's presence was unlawful and that he enjoyed a reasonable expectation of

privacy in the premises.  <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 104 (1980).

In this case, Defendant argues that the Government did not establish that Detective Fries was lawfully present in the trauma room where he seized Defendant's clothing, objecting to Magistrate Judge Brill's findings that the Government's evidence supported an "inference" that Detective Fries was lawfully present and that case law supports a conclusion that Defendant did not enjoy a reasonable expectation of privacy [Doc. 47 at 10-16]. Defendant's objections lack merit.  As a preliminary matter, Defendant improperly places the burden of proof to establish lawful presence on the Government.  As noted above, Defendant bears the burden of showing that he had a reasonable expectation of privacy in the Grady Hospital trauma room.  <u>Rawlings</u>, 448 U.S. at 104.

Additionally, Defendant's substantive objections are unfounded.  First, case law does in fact support Magistrate Judge Brill's finding that Defendant did not have a reasonable expectation of privacy in the Grady Hospital trauma room.  The Supreme Court of the United States has established a two-prong test for determining whether a reasonable expectation of privacy exists in a particular circumstance: (1) whether the defendant had "a subjective expectation of not being discovered"; and (2) whether this expectation is "one that society is prepared to recognize as reasonable." <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 n.12 (1978) (internal quotation marks omitted).  Thus, even if Defendant asserts that he had an actual expectation of privacy in the trauma room, Defendant's expectation of privacy must also be reasonable for his Fourth Amendment protections to attach.  If

17

Defendant has no reasonable expectation of privacy in the trauma room in which Detective Fries and the clothing were located, the Fourth Amendment is not implicated and the seizure of incriminating evidence in plain view is presumptively reasonable. Payton v. New York, 445 U.S. 573, 586-87 (1980).

Here, to the extent Defendant had an actual expectation of privacy, that expectation was unreasonable in light of case law on point and in light of evidence tending to show that Detective Fries was lawfully present in the trauma room where he observed Defendant's clothing in plain view. Courts in numerous jurisdictions have held that a defendant does not have a reasonable expectation of privacy in an emergency, operation, or—directly on point—trauma room that the defendant shares with other patients and in which medical staff administers critical treatment. See, e.g., Dombrovski v. State, Nos. A-7238, A-4253, 2000 WL 1058953, at *1, 3 (Alaska Ct. App. Aug. 2, 2000) (no reasonable expectation of privacy when police trooper entered a "temporary holding room for emergency treatment," its door open, and questioned and tested defendant, who was sitting on a hospital gurney while medical personnel walked into and out of the holding room); People v. Torres, 494 N.E.2d 752, 755 (Ill. App. Ct. 1986) (no reasonable expectation of privacy in hospital emergency room because the "record contains no suggestion that the defendant was in a position to either permit or deny anyone, including a police officer, access to the emergency room"); State v. Cromb, 185 P.3d 1120, 1122, 1126 (Or. Ct. App. 2008) (no reasonable expectation of privacy in a "curtained off" area of the emergency room that was not open to the general public); State v. Rheaume, 889 A.2d 711,

714 (Vt. 2005) (no reasonable expectation of privacy in a hospital's trauma room, located within the emergency room, which was a "freely accessible area over which a patient has no control" (internal quotation marks omitted)).

The Court agrees with these jurisdictions and with Magistrate Judge Brill that Defendant did not have a reasonable expectation of privacy in the Grady Hospital trauma room.   Despite the holdings of these courts, Defendant argues that a hospital trauma room "is perhaps more intrusive for third parties to insert themselves there" than in a private hospital room and that only medical personnel should be present [Doc. 47 at 15].   This argument is not only foreclosed by the holdings of these courts, but also by the sound reasoning upon which these courts relied, which the Court adopts.   "While it is true that the public at large may not freely access the emergency area, medical personnel, hospital staff, patients and their families, and emergency workers—including police officers—are, as a matter of course, frequently, and not unexpectedly, moving through the area." Rheaume, 889 A.2d at 714.   Further, "an emergency treatment area, or a 'trauma room' located therein, is, for purposes of constitutional privacy protections, 'public' and can afford no reasonable expectation of privacy." Id. (citing cases from state and federal jurisdictions).   Thus, Defendant cannot rely on an unsupported assumption that only medical personnel should be permitted access to a trauma room to argue that he had a reasonable expectation of privacy therein.   Indeed, as the foregoing case law makes clear, Defendant had no right to exclude individuals from—and could reasonably expect limited public access

within—the trauma room, a reality that precludes Defendant from asserting a reasonable expectation of privacy under these circumstances.

Defendant also objects to the R&R on grounds that Magistrate Judge Brill improperly relied upon Detective Fries' testimony that a hospital staff member directed him to Mr. Mahone in the trauma room and that hospital staff did not thereafter ask him to leave to conclude that Detective Fries was lawfully present [Doc. 47 at 12].   According to Defendant, these facts do not support an "inference" that Detective Fries was lawfully present in the trauma room [Id. at 12-13].   Further, according to Defendant, an "inference" is insufficient to withstand constitutional scrutiny regardless of its factual support [Id. at 13].

The Court disagrees.  The issue of whether a defendant enjoys a reasonable expectation of privacy in a particular circumstance is fact-intensive, and the Court is free to examine the entire record to contextualize the inquiry.  United States v. Siau, 281 F. App'x 949, 950 (11th Cir. 2008) (citing California v. Ciraolo, 476 U.S. 207, 211 (1986)).  The facts that Detective Fries asked a hospital staff member for Mr. Mahone's whereabouts, that the staff member directed Detective Fries to the trauma room, and that hospital staff never asked Detective Fries to leave the trauma room all support Magistrate Judge Brill's conclusion that Detective Fries was lawfully present in the trauma room.   See, e.g., Dombrovski, 2000 WL 1058953, at *1-3 (finding that a "temporary holding room for emergency treatment" was of a "public nature" when a police trooper asked where defendant was being treated and was directed to the room and when hospital personnel

"walked in and out" during the trooper's interview and did not ask the trooper to leave); People v. Brown, 151 Cal. Rptr. 749, 754 (Cal. Ct. App. 1979) ("The notion that a nurse can authorize a visitor's entrance (albeit on official business) seems not only to accord with the everyday practice of hospitals . . . but with everyday expectations of hospital patients."); State v. Thompson, 585 N.W.2d 905, 911 (Wis. Ct. App. 1998) ("[T]he consent for the officer to be present was given by hospital staff . . . who had at least common, if not exclusive, authority over the premises.  The consent of someone with authority over the premises would support a valid search, even if it were an area deemed private.").  Thus, to the extent that an inference was even required, Magistrate Judge Brill did not improperly rely upon the disputed evidence in reaching the conclusion that Detective Fries was lawfully present in the Grady Hospital trauma room.

> 2.  Detective Fries' Lawful Access to the Clothing in Plain View

The plain view exception to the warrant requirement also mandates that the item seized be in "in plain view." Horton, 496 U.S. at 136.  This means that the officer must not only be lawfully present in the location in which the evidence is situated, but must also "have a lawful right of access to the object itself." Id. at 137.  That Defendant's cut up and bloody clothing was in plain view in the trauma room is not in dispute. Despite this, Defendant asserts that he retained a possessory interest in the clothes and that Detective Fries therefore did not have a lawful right of access to the clothing [Doc. 47 at 16].

21

The Court disagrees with this reasoning.  The requirement of lawful access to the object itself "is implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance."  United States v. Naugle, 997 F.2d 819, 823 (10th Cir. 1993).  "In those cases the officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises."  Id. (holding that an officer had lawful access to the firearm seized because it "was in the closet where the officer was permitted to be, and he did nothing more than reach out to the box containing the gun"); see also Hromada, 49 F.3d at 690 (holding that an officer had lawful access to marijuana plants in plain view within the defendant's house, to which the officer also enjoyed lawful access); United States v. Patterson, No. 10-1052, 2010 WL 5128657, at *3 (3d Cir. Dec. 16, 2010) (applying the plain view exception to a firearm found in a car door when "the officers had a lawful right of access to the firearm because it was in an open car, visible, and accessible to anyone in the public area outside of the Presidential Apartments" where the car was parked (internal quotation marks omitted)).  This rule "ensures that the scope of the intrusion into Fourth Amendment rights is no greater than that already authorized in connection with the lawful entry."  Jones v. State, 648 So. 2d 669, 678 (Fla. 1994).

The instant situation is similar to that in Naugle.  Just like the officer in Naugle was lawfully permitted to be in the closet in which the box containing the firearm was stored,

Detective Fries was lawfully permitted to be in the trauma room in which Defendant's clothing was thrown to the floor.  997 F.2d at 823.  Indeed, like the officer in Naugle, Detective Fries merely had to "reach out" to the floor containing the clothing.  Id. Thus, Defendant's argument that Detective Fries did not have lawful access to the clothing because he retained a possessory interest in it lacks merit.

Defendant also asserts that the Grady Hospital Policy governing patient personal valuables forecloses Magistrate Judge Brill's conclusion that Detective Fries had a lawful right of access to the clothing [Doc. 47 at 18-22].  This argument also fails.  Contrary to Defendant's assertions, the Policy that Defendant introduced at the suppression hearing does not seem to apply to the situation at issue here.  The Policy delineates a strict process involving no fewer than three hospital personnel tasked with removing, cataloguing, and storing a patient's valuables [Defendant's Ex. 12 at 2-3].  It also requires staff to place the clothing on a "designated desk," identify and announce the types of valuables removed, annotate those items on a Patient Care Record, and then reconcile the valuables with the Patient Care Record and prepare a Patient Valuables Checklist form [Id.]. None of these procedures occurred here, and it seems unlikely that hospital staff would have gone through such pains to preserve Defendant's bloody, cut up, and unwearable clothing for his reclamation after treatment, especially in light of the Policy's broad disclaimer of liability which states that Grady Hospital "is not responsible for loss and/or damage of personal effects or valuables" [Id. at 5].  The Court accordingly finds that the

Policy applies to Defendant's clothing only insofar as it precludes Grady Hospital's liability for the loss or damage thereof. The Policy therefore does not establish that Detective Fries did not have a lawful right of access to Defendant's clothing.

### 3. The Incriminating Nature of the Clothing

The final element of the plain view exception requires the incriminating character of the evidence seized to be "'immediately apparent.'" Horton, 496 U.S. at 136 (quoting Coolidge, 403 U.S. at 466). "For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." United States v. Wright, 324 F. App'x 800, 804 (11th Cir. 2009). Defendant contends that the incriminating nature of his bloody clothes was not immediately apparent, arguing that Magistrate Judge Brill improperly relied on Detective Fries' testimony of Mr. Mahone's identification of Defendant, on the close proximity of the two shootings, and on the consistency of Defendant's gunshot wounds with Mr. Mahone's description of the shooting [Doc. 47 at 22-23].

The Court does not agree. Defendant made no showing that the evidence upon which Magistrate Judge Brill relied—which amply illustrated that Defendant's blood-soaked clothing was incriminating evidence—was insufficient to support a finding of probable cause. Defendant instead makes a sweeping, unsupported assertion that the voice identification of Defendant by Mr. Mahone was unreliable because, as a gunshot victim, Mr. Mahone "was in no condition to make a reliable voice identification" [Doc. 47 at 22]. This speculative contention is in contrast to the record—in

24

which Detective Fries described Mr. Mahone as "doing pretty good"—and does not convince the Court that the incriminating nature of the clothing was not immediately apparent.

Because the Court agrees with Magistrate Judge Brill's conclusion that the circumstances of this case fall squarely within the plain view exception to the warrant requirement and therefore within the confines of the Fourth Amendment, Defendant's objections [Doc. 47] to the R&R [Doc. 41] respecting his Motion to Suppress Evidence are OVERRULED.

C.    Defendant's Motion to Suppress Statements

Defendant also objects to Magistrate Judge Brill's conclusion that Colorado v. Spring, 479 U.S. 564 (1987), controls Defendant's statement at the Fulton County Jail thereby foreclosing Defendant's argument that the statement was the product of deception and that it must therefore be suppressed.  In the R&R, Magistrate Judge Brill found that Defendant failed to establish that Special Agent McLeod and Agent Light misrepresented the reasons for the interview and that, in the absence of misrepresentation, Defendant's statements should not be suppressed [Doc. 41 at 14].

Specifically, Magistrate Judge Brill found that Special Agent McLeod's statement to Defendant that the agents were there to speak about a federal investigation and not to discuss Defendant's pending state charges was a true statement even though both the state and potential federal charges arose out of the same incident [Id.].    According to Magistrate Judge Brill, Special Agent McLeod's statements about the nature of the interview fell squarely within the confines of Colorado v. Spring, in which the

25

Supreme Court held "that a 'suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege'" against self-incrimination (embodied by the Miranda warnings) [Id. at 15 (quoting Spring, 479 U.S. at 577)]. Consequently, according to Magistrate Judge Brill, Defendant's statements were not obtained through deceptive means and were therefore admissible [Id.].

The Court agrees. Critically, Defendant's argument in objection to the R&R—that he waived his Fifth Amendment rights because he was affirmatively misled to believe that the agents did not intend to discuss the McDonald's robbery—is based on an incorrect sequence of events. According to Defendant, when Special Agent McLeod asked him whether he wished to waive his Fifth Amendment rights, he said to Special Agent McLeod, "I just don't know why you are here" [Doc. 47 at 3]. Special Agent McLeod purportedly answered that he was there to discuss a federal investigation and not Defendant's state charges [Id.]. Defendant states that he then resultantly agreed to waive his Fifth Amendment rights [Id.].

This account conflicts with Special Agent McLeod's uncontroverted testimony at the suppression hearing. Special Agent McLeod testified that he first read Defendant the Miranda warnings, then asked Defendant whether he wished to waive his Fifth Amendment rights, at which time Defendant stated "Yes. I just don't know why you are here" [Tr. at 65]. In other words, Defendant waived his Fifth Amendment rights *before* stating that he

26

did not know why the agents were there.  Only after Defendant waived his Fifth Amendment rights did Special Agent McLeod state that he and Agent Light were at the jail to discuss a federal investigation, not Defendant's pending state charges [Id. at 65-66; Defendant's Ex. 9 at 1].  Thus, the record clearly indicates that Special Agent McLeod's statement to Defendant that the agents were at the jail to discuss a federal investigation came after Defendant's waiver and therefore could not have induced Defendant to waive his Fifth Amendment rights.

Because the Court finds that the sequence of events shows that Special Agent McLeod and Agent Light did not tell Defendant why they were at the jail before Defendant agreed to waive his Fifth Amendment rights, the Court agrees with Magistrate Judge Brill that this case is controlled by Colorado v. Spring, 479 U.S. 564 (1987).  In Spring, the Supreme Court addressed "whether the suspect's awareness of all the crimes about which he may be questioned is relevant to determining the validity of his decision to waive the Fifth Amendment privilege" against self-incrimination.  Id. at 566.  In that case, ATF agents arrested defendant Spring, who was suspected of killing a man named Donald Walker during a hunting trip, during a firearms purchase sting operation.  Id.  Once Spring was in custody, the agents advised him of his Miranda rights, at which time he signed a written form indicating that he understood and intended to waive his Fifth Amendment rights.  Id. at 567.  The agents then questioned Spring about certain firearms transactions that led to his arrest, asked him about his criminal record, and then asked him whether he shot a man named Walker and threw the body into a snowbank.  Id.

27

Spring paused, ducked his head, and said "no," at which time the agents ceased questioning. Id.

Spring was subsequently charged with first-degree murder. Id. at 568. He moved to suppress his statements, arguing that his Miranda waiver was invalid because the ATF agents failed to inform him that they would question him about the murder. Id. The Supreme Court disagreed, holding that so long as a defendant has a "full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it," and the defendant's relinquishment of the right "was the product of a free and deliberate choice rather than intimidation, coercion, or deception," the "failure of the law enforcement . . . to inform [the defendant] of the subject matter of the interrogation," absent affirmative misrepresentation, "could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner." Id. at 573, 577 (internal quotation marks omitted).

This rule applies here. Defendant makes no argument apart from his assertion of affirmative misrepresentation (which the Court rejected above) that his waiver was not made knowingly and voluntarily. Special Agent McLeod and Agent Light were merely silent about the purpose of their interview at the time Defendant waived his Fifth Amendment rights. In accordance with Spring, this silence does not affect Defendant's waiver and therefore does not merit suppression of Defendant's statements. Defendant's objections [Doc. 47] to the R&R [Doc. 41] respecting his Motion to Suppress Statements are therefore OVERRULED.

28

IV.  <u>Conclusion</u>

Having reviewed the R&R and Defendant's objections thereto, and for the foregoing reasons, Magistrate Judge Brill's R&R [Doc. 41] is ADOPTED, Defendant's objections to the R&R [Doc. 47] are OVERRULED, and Defendant's Motion to Suppress Statements [Doc. 13] and Motion to Suppress Evidence [Doc. 15] are DENIED.

SO ORDERED this __14__ day of April, 2011.


                                    _____
                                    ORINDA D. EVANS
                                    UNITED STATES DISTRICT JUDGE